## <u>CONTINUATION OF AN APPLICATION FOR A SEARCH WARRANT</u>

I, Gregory Pond, being duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this continuation as part of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — specifically,

      a.  One black Apple iPhone inside a black rubber case ("**Subject Device 1**"), as described in Attachment A — that is currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Device, as described in Attachment B.

      b.  One black Verizon Orbic Cell Phone with a cracked screen in a black case ("**Subject Device 2**") as described in Attachment A — that is currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Device, as described in Attachment B.

      c.  One black Nokia Flip Phone, IMEI#: 358712911188009[1] ("**Subject Device 3**") as described in Attachment A — that is currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Device, as described in Attachment B.

---

[1] I have been unable to discern the IMEI numbers for Subject Devices 1 and 2, which is why they are not included in this continuation.

    d.    One Samsung Boost Cell Phone in a blue case, IMEI#: 352271521544446, ("**Subject Device 4**") as described in Attachment A — that is currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Device, as described in Attachment B.

2.    The **Subject Devices** are currently in the possession of the Battle Creek Police Department in Battle Creek, Michigan.

3.    I note that **Subject Devices 1 – 4** were seized during the execution of a State of Michigan search warrant by Battle Creek Police at 365 N. Kendall Street in Battle Creek on May 3, 2024. Battle Creek Police investigators obtained a state of Michigan search warrant to examine **Subject Devices 1 – 4** on May 10, 2024 and extracted data from **Subject Devices 1 – 4** pursuant to that state warrant. However, the U.S. Attorney's Office reviewed that warrant and believes there is a possible deficiency in it. Consequently, I submit this continuation in support of a federal warrant to re-examine Subject Devices 1 – 4 and the extractions that were made from execution of the original state warrant.

4.    I, Gregory Pond, am a Special Agent (SA) of the United States Department of Justice Drug Enforcement Administration (DEA) and, as such, am an Investigator or Law Enforcement Officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been

2

employed as a Special Agent of the DEA since April, 2005, and am currently assigned to the DEA Kalamazoo, Michigan Post of Duty. Prior to being employed by the DEA, I was employed for 5 years as a full time Police Officer and as a full time Deputy Sheriff. During the course of my law enforcement experience I have participated in numerous investigations involving controlled substances. In 2004, I attended a sixteen-week Basic Agent Training program in which I was educated by the DEA on the origins of illegal drugs and the methods used by drug traffickers to manufacture drugs both outside and inside the United States. I was trained on methods used to smuggle, transport and distribute these drugs and drug proceeds. In 2005, I was assigned to the DEA St. Louis Division and assigned to conduct investigations of a variety of illegal drug trafficking and money laundering organizations. Investigations I was involved in led to the seizure of illegal drugs manufactured both outside and inside the United States, weapons used by drug traffickers for protection and intimidation, assets derived from the sale of illegal drugs and the arrests of individuals involved. As a DEA Special Agent, I have participated in multiple investigations involving Title III authorized wiretaps. I have had specialized training from the DEA regarding telephone data exploitation. I have participated in numerous drug related training courses in my prior local level law enforcement experience as well as throughout my career with the DEA.

5.     Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of drug proceeds, and the dialect

3

(lingo) and coded language used by drugs traffickers. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money laundering, as well as conspiracy and attempt to do the same, in violation of Title 18, United States Code, Sections 1956 and 1957.

6.     I know from my training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions.  Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers, customers, and confederates. Mobile telephones are portable, and phone providers often do not require purchasers or users of the devices to provide their true names and/or addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement.  Mobile phones often contain evidence of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of drugs, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time. Wireless phones or smart phones also have the capability of facilitating monetary

transactions relating to drug dealing, including through the use of cash or bank applications that allow for the electronic transfer of funds.

7. Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

b. Drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going drugs business and often store information related to the profits of their drugs trafficking on their devices;

c. User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

d. Drug traffickers often use the Internet to look up various information to support their drug trafficking activities on their devices;

e. Drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns.  Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from.  Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

f.    It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds on their devices. This evidence includes information related to currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers; and

g.    Drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service and frequently keep copies of tracking numbers, receipts and photographs of packaged drugs on their devices.

8.    The information set forth in this continuation is based upon my personal knowledge and participation in the investigation described below, as well as information provided to me by other law enforcement officers. I have not set forth all of the information known to me or known to other law enforcement officers concerning this matter. This continuation is intended to show only that there is sufficient probable cause for the requested search warrant.

9.    Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically Title 21, United States Code, Sections 841 and 846, distribution and/or possession with intent to distribute controlled substances, and conspiracy to do the same, will be found on the **Subject Devices**, which are described in Attachment A. The categories of electronically stored information and evidence sought are described in Attachment B.

6

## IDENTIFICATION OF THE SUBJECT DEVICES

10.     The **Subject Devices**, the property to be searched, are described as a black Apple iPhone inside a black case, a black Verizon Orbic cell phone with a cracked screen in a black case, a black Nokia flip phone and a Samsung Boost cell phone in a blue case, IMEI#:352271521544446, seized pursuant to a state of Michigan authorized search warrant executed at the residence of Akil Khalid McKINNEY, ("McKINNEY") located at 365 N. Kendall Street, Battle Creek, MI.  During the search of McKINNEY's residence, suspected fentanyl, crack cocaine, firearms, ammunition and US currency were seized by Battle Creek Police. The **Subject Devices** are currently located at a secure Battle Creek Police Department facility within the Western District of Michigan.

11.     The applied-for warrant would authorize the forensic examination of the **Subject Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

12.     In November of 2023, Battle Creek Police investigators developed information indicating Akil Khalid McKINNEY was involved in drug trafficking in the Battle Creek, MI area. Rental car history, cell site data, and vehicle detection reports regarding McKINNEY were obtained and the Drug Enforcement Administration (DEA) and Department of Homeland Security Investigations (HSI) were notified and became involved in the investigation, in assistance to the Battle

Creek Police Department.

13. On 01-05-2023, Battle Creek Police investigators observed a silver Chevrolet Blazer sport utility vehicle stop at 96 Oak Street, Battle Creek, MI and leave minutes later. Battle Creek Police investigators were aware the residence at 96 Oak Street was a suspected drug house location. Battle Creek Police investigators initiated a traffic stop on the Chevrolet Blazer a short distance away from the Oak Street address. The driver was identified as Akil Khalid McKINNEY, who acknowledged that he had approximately $7,000.00 in U.S. currency in the center console of the Chevrolet Blazer. As a result of the traffic stop, McKINNEY was found to have several valid state of Michigan arrest warrants and was arrested/lodged at the Calhoun County Jail on the outstanding arrest warrants. The vehicle was determined to be a rental vehicle and Battle Creek Police investigators seized the $7000.00 US currency from the center console of the Chevrolet Blazer. The rental vehicle was towed at the rental vehicle company's request. Prior to the vehicle being towed, Battle Creek Police investigators conducted a vehicle inventory search. While searching the Chevrolet Blazer, Battle Creek Police investigators lifted the floor panel of the spare tire compartment. Investigators observed water running off of the floor panel and pooling in the spare tire compartment. Investigators observed the spare tire and area around the spare tire was also wet but the rest of the rear trunk was dry. Investigators noted it was raining at the time of the traffic stop.

14. Battle Creek Police investigators know that drug dealers often sell illegal drugs for U.S. currency. Investigators know drug traffickers utilize

compartments, voids and hides in vehicles such as tires and the spare tire compartment to conceal drugs. Based on Battle Creek Police investigator's training and experience, investigators had reason to believe McKINNEY utilized the spare tire compartment to conceal drugs that were removed from the spare tire area of the Chevrolet Blazer, in the rain, and moved into the residence at 96 Oak Street prior to the traffic stop. After removing/dropping off the drugs, investigators believed the wet spare tire was replaced into the spare tire compartment in the rental vehicle.

15.     On 01-05-2023, Battle Creek Police investigators continued surveillance of 96 Oak Street and observed what was believed to be a hand-to-hand transaction and several individuals coming and going from within the residence at 96 Oak Street.

16.     On 01-05-2023, Battle Creek Police investigators were contacted by a confidential informant (CI) who will be referred to as "X". X has proven to Battle Creek Police investigators that X is a reliable informant by providing credible and reliable information that has led to the seizure of illegal drugs. X advised Battle Creek Police investigators that a subject/subjects operating the drug house at 96 Oak Street, Battle Creek, MI, had just received a supply of drugs. X stated that the subject (McKINNEY), who was traffic stopped by Battle Creek Police earlier in the day, was the person who dropped off the drugs at 96 Oak Street.

17.     On 01-05-2023, Battle Creek Police investigators obtained a state of Michigan drug search warrant for 96 Oak Street. The search warrant was executed on the morning of 01-06-2023 and a bag of blue pills was seized. Battle Creek Police

investigators had the blue pills analyzed by the Battle Creek Police laboratory and the blue pills were found to contain fentanyl.

18.     In August of 2023, Battle Creek Police investigators obtained information, from a federal proffer interview, indicating McKINNEY was selling heroin, cocaine and guns and was living on Roseneath Avenue near Howland Street in Battle Creek. Battle Creek Police had knowledge that McKINNEY was living at 65 Roseneath Avenue and that 65 Roseneath Avenue is just east of Howland Street in Battle Creek, MI. Information from the federal proffer interview also indicated the source of supply for McKINNEY's drugs was located on the west side of Detroit, MI.

19.     Battle Creek Police investigators obtained a receipt from Hertz Rent A Car, indicating a Chevrolet Suburban, MI registration EST 9270, was rented by Akil McKINNEY from 09-04-2023, until 10-25-2023. Homeland Security Investigations (HIS) investigators utilized electronic surveillance to obtain several photos and locations of the rented Suburban. Battle Creek Police and HSI investigators investigated McKINNEY and the rented Suburban's movements, determining the following. Between 09-04-2023 and 10-25-2023, the Suburban rented by McKINNEY, was driven to several cities to include Detroit, MI, Indianapolis, IN, Chicago, IL and St. Louis, MO, using several major highways to include I-94, I-69, I-90, I-55 and I-65. In a trip that began on 09-17-2023, the rented Suburban travelled on west bound I-94 from the Michigan/Indiana state line to the Chicago area. The Suburban returned to Michigan on 09-19-2023, via I-94.

20.     On another trip beginning on 09-23-2023, the Suburban rented by

McKINNEY travelled on west bound I-94 from the Michigan/Indiana state line to I-65 where the vehicle moved south bound on I-65 to Indianapolis, IN. On 09-24-2023 the Suburban travelled around the city of Indianapolis, then on 09-25-2023, the Suburban traveled north bound on I-65, then east bound on I-94 returning to Michigan.

21.     Another trip beginning on 09-28-2023, the Suburban rented by McKINNEY was recorded travelling west bound on I-94 from the Michigan/Indiana state line, then south bound on I-55 to St. Louis, MO. From 09-29-2023 to 10-01-2023, the Suburban moved around the St. Louis area. Battle Creek Police investigators believe some time after 10-01-2023 the Suburban traveled back to Michigan via an alternate route not equipped with traffic monitoring equipment.

22.     On 10-08-2023, the Suburban rented by McKINNEY travelled west bound on I-94 from the Michigan/Indiana border and into the Chicago, IL area. On the same day, the Suburban traveled back east bound into Michigan.

23.     On 10-17-2023, the Suburban rented by McKINNEY was driven east bound on I-94 to the Detroit, MI area. Investigators believe the Suburban returned to the Battle Creek area via an alternate route not equipped with traffic monitoring equipment.

24.     Based on prior experience, Battle Creek Police, HSI and DEA investigators believe the travel patterns of the Suburban rented by McKINNEY, being long in distance, short turnaround time frames, to and from locations south of Michigan to large cities situated along major interstates to include Chicago,

11

Indianapolis and St. Louis, as well as to and from cities along southern Michigan's I-94 corridor such as Battle Creek and Detroit, are consistent with the transportation of drugs and drugs proceeds. Investigators know that that drug traffickers commonly use rental cars for illegal purposes to prevent identification of themselves and to limit the exposure of personally owned vehicles being seized by law enforcement.

25.     Investigators identified a 2019 incident involving McKINNEY where he was traffic stopped while operating a vehicle by Battle Creek Police. Battle Creek Police officers discovered suspected drugs, believed to have been thrown from the vehicle McKINNEY was driving prior to the traffic stop. McKINNEY was subsequently arrested for possession with intent to sell crack cocaine. Battle Creek Police laboratory results of the suspected drugs identified a package of approximately 12 grams of fentanyl, another package of approximately 5 grams of fentanyl and a third package of approximately 28 grams of cocaine. Calhoun County, MI court records indicated a charge for possession of controlled substance, greater than 25 grams, was dismissed and McKINNEY had pleaded guilty to a misdemeanor charge of controlled substance use.

26.     In October of 2023, Battle Creek Police investigators were contacted by a CI who will be referred to as "Y". Y has proven to Battle Creek Police investigators that Y is a reliable informant by providing credible and reliable information that has led to the seizure of illegal drugs. Y advised Battle Creek Police investigators that the phone number 269-339-1300 (**Subject Device 1**) is a number that Y uses to contact McKINNEY to purchase drugs. Y indicated Y has been purchasing drugs from

McKINNEY for a few years. Y further stated McKINNEY utilizes various rental vehicles to conduct drug transactions. Y stated McKINNEY tells Y that McKINNEY is going to "re-up," then McKINNEY travels to Florida. "Re-up" is a term known to investigators to be slang for obtaining additional drugs for re-sale, when a trafficker has sold out of drugs.

27.    In October of 2023, Battle Creek Police investigators conducted a controlled purchase of crack cocaine from McKINNEY, through Y. Y and Y's vehicle were searched for US currency, drugs and weapons with negative results. Y was provided an amount of pre-recorded U.S. currency, and Y contacted McKINNEY on **Subject Device 1**, the same number Y had used to contact McKINNEY to purchase drugs in the past. Y spoke with McKINNEY and an order of crack cocaine was placed by Y. McKINNEY directed Y to come to 65 Roseneath Avenue, Battle Creek, MI, a residence known to investigators as McKINNEY's residence at the time. Investigators followed Y to the area of 65 Roseneath Avenue, where they observed Y exit Y's vehicle and walk to the front door of 65 Roseneath Avenue where Y knocked on the door. Y was observed returning from front door area of 65 Roseneath Avenue to Y's vehicle a short time later. Y was followed by Battle Creek Police investigators to a pre-determined location where Y and Y's vehicle were again checked for US currency and weapons. No US currency or weapons were found and Y turned over a knotted off, clear plastic baggy containing an off-white chunky substance believed to be crack cocaine. Y indicated the plastic baggy was the suspected crack cocaine that Y just purchased from McKINNEY at 65 Roseneath Avenue.  The suspected crack

cocaine was field tested by Battle Creek Police investigators positive for the presence of cocaine.

28.     In January of 2024, a purchase of crack cocaine and heroin (suspected fentanyl) from McKINNEY was initiated through Y. Battle Creek Police met Y at a predetermined location where Y and Y's vehicle were checked for US currency, drugs and weapons, with none found. Y was provided an amount of prerecorded U.S. currency for the purchase of drugs. Y contacted McKINNEY on **Subject Device 1** and ordered an amount of crack cocaine and heroin. McKINNEY advised Y to meet at a location within the city of Battle Creek. Battle Creek Police had initiated surveillance of 65 Roseneath Avenue prior to Y's call. Investigators observed a silver Jeep leave the driveway of 65 Roseneath Avenue and arrive at the meet location that was given to Y by McKINNEY. Investigators followed Y to the meet location within the city of Battle Creek. Y exited Y's vehicle and made contact with Amanee Latrice MAYS, who was driving the silver Jeep. MAYS was known to Y from prior interactions. Y was observed leaving MAYS' Jeep after a short time and returning to Y's vehicle. Y was surveilled returning to the pre-determined meeting location with Battle Creek Police investigators. Y and Y's vehicle were again checked for US currency and weapons. No US currency or weapons were found and Y turned over a knotted off, clear plastic baggy containing an off-white chunky substance believed to be crack cocaine. Y also handed over a clear knotted off baggie of an off-grey colored powder, suspected to be fentanyl.  Y advised Y had just purchased the crack cocaine and heroin (suspected fentanyl) from Amanee MAYS. Investigators field tested a

14

portion of the suspected crack cocaine and the test indicated the presence of cocaine. Due to safety concerns regarding fentanyl, the suspected fentanyl was not field tested. Y advised investigators when McKINNEY is unavailable to deliver drugs, McKINNEY will send MAYS to sell Y drugs. A known photograph of MAYS was shown to Y. Y indicated that the photograph was a picture of Amanee MAYS, who is known to Y and the person who sold the drugs to Y on that day.

29.     On 02-07-2024, a Calhoun County Michigan Circuit Court judge signed a search warrant which authorized investigators to receive certain records from Verizon Wireless, to include GPS location data for **Subject Device 1**. Since 02-07-2024, investigators have requested and received three additional state of Michigan search warrants, in Calhoun County, for GPS location data for **Subject Device 1**.

30.     On 02-08-2024, investigators monitored GPS location data from McKINNEY's phone, **Subject Device 1**. GPS location data indicated the device was located in the Battle Creek, MI area, the data also indicated there were periods of time where "no location return for target" was recorded. GPS location data indicated the device was next located in the Detroit, MI area. During the time the device was located in the Detroit area, the GPS location data again indicated there were periods of time where "no location return for target" was recorded. The phone was then located back in the Battle Creek area. Based on the training and experience of the affiant and the investigative team, it is believed that the GPS location data indicating "no location return for target," is likely due to the device user turning off the cellular device or disabling the cellular signal of the device to prevent law enforcement to

15

accurately track the location of the device.

31.     On 02-15-2024, investigators monitored GPS location data from McKINNEY's phone, **Subject Device 1**. The GPS location data indicated the device was located in the Battle Creek area, the data also indicated there were periods of time where "no location return for target" was recorded. GPS location data indicated the device was next located in the Detroit area. The data indicated the device remained in the Detroit area until the evening of 02-16-2024, when GPS location data indicated periods of time where "no location return for target" was recorded. **Subject Device 1** was then located back in the Battle Creek area.

32.     On the afternoon of 02-25-2024, investigators monitored GPS location data from McKINNEY's phone, **Subject Device 1**. GPS location data indicated the device was located in the Battle Creek area, the data also indicated there were periods of time where "no location return for target" was recorded. GPS location data indicated the device was next located in the Detroit area. During the time the device was located in the Detroit area, the GPS location data again indicated there were periods of time where "no location return for target" was recorded. The phone was then located back in the Battle Creek area.

33.     In February of 2024, a purchase of crack cocaine and heroin (suspected fentanyl) from McKINNEY was initiated through Y. Battle Creek Police met Y at a predetermined location where Y and Y's vehicle were checked for US currency, drugs and weapons, with none found. Y was provided an amount of prerecorded U.S. currency for the purchase of drugs. Y called McKINNEY on **Subject Device 1** and

McKINNEY did not answer. Y indicated that Y contacted McKINNEY earlier in the day and McKINNEY advised Y that if McKINNEY didn't answer the phone, Y could just stop by 65 Roseneath Avenue. The decision was made for Y to drive to 65 Roseneath Avenue, as McKINNEY previously instructed. While Y was in route to 65 Roseneath Avenue, Y received a call from McKINNEY, who called Y from MAYS' cell phone (269-529-0232) and advised Y to meet McKINNEY at a location in Battle Creek. Battle Creek Police investigators were surveilling 65 Roseneath Avenue during this time and observed a grey Dodge Durango leaving the driveway of 65 Roseneath Avenue, travelling to the meet location given by McKINNEY, making no stops along the way. Y advised investigators that MAYS was then driving a grey Dodge Durango with a Nebraska license plate YBW 983. Investigators followed Y to the area of the meet location in Battle Creek. Y exited Y's vehicle and made contact with MAYS, who arrived driving the grey Durango. Y was observed leaving MAYS' Durango after a short time and returning to Y's vehicle. Y was surveilled returning to the pre-determined meeting location with Battle Creek Police investigators. Y and Y's vehicle were again checked for US currency and weapons. No US currency or weapons were found and Y turned over a knotted off, clear plastic baggy containing an off-white chunky substance believed to be crack cocaine. Y also handed over a folded piece of paper containing an off-grey colored powder, suspected to be fentanyl. Y advised Y had just purchased the crack cocaine and heroin (suspected fentanyl) from MAYS, and McKINNEY was in the back seat of the Durango during the transaction. Investigators field tested a portion of the suspected crack cocaine and

17

the test indicated the presence of cocaine. Due to safety concerns regarding handling fentanyl, the suspected fentanyl was not field tested.

34.     In late March 2024, investigators determined McKINNEY had apparently sold his residence at 65 Roseneath Avenue. Efforts were put into place to locate McKINNEY's new residence.

35.     In April 2024, a purchase of crack cocaine and heroin (suspected fentanyl) from McKINNEY was initiated through Y. Battle Creek Police and Michigan State Police Southwest Enforcement Team investigators met Y at a predetermined location where Y and Y's vehicle were checked for US currency, drugs and weapons, with none found. Y was provided an amount of prerecorded U.S. currency for the purchase of drugs. Y contacted McKINNEY on **Subject Device 1** and McKINNEY directed Y to meet at a location in Battle Creek. Investigators followed Y to the area of the meet location within Battle Creek. Y exited Y's vehicle and made contact with MAYS, who was driving the grey Dodge Durango, Nebraska license plate YBW 983. Y was observed leaving MAYS' Durango after a short time and returning to Y's vehicle. Y was surveilled returning to the pre-determined meeting location with Battle Creek Police investigators. Y and Y's vehicle were again checked for US currency and weapons. No US currency or weapons were found and Y turned over a knotted off, clear plastic baggy containing an off-white chunky substance believed to be crack cocaine. Y also handed over a knotted off, clear plastic baggy containing an off-grey colored powder, suspected to be fentanyl.  Y advised Y had just purchased the crack cocaine and heroin (suspected fentanyl) from MAYS and

McKINNEY was in the back seat of the Durango during the transaction. Investigators field tested a portion of the suspected crack cocaine and the test indicated the presence of cocaine. Due to safety concerns regarding handling fentanyl, the suspected fentanyl was not field tested.

36.     In April 2024, investigators were monitoring court authorized GPS location data for **Subject Device 1** while conducting mobile surveillance in the area of the GPS locations, in an attempt to locate McKINNEY's new residence. While driving by 365 N. Kendall Street, Battle Creek, MI, investigators observed MAYS' grey Dodge Durango, Nebraska license plate YBW 983, in a shared driveway between 361 and 365 N. Kendall Street. 361 N. Kendall Street appeared to be abandoned, with boarded over windows. Investigators observed MAYS walking up the driveway and towards the side door of 365 N. Kendall Street. Investigators also located a blue Nissan Rogue in the same driveway bearing a California license plate, 9GGV470. Law Enforcement Information Network records indicated the California licensed Nissan Rogue was a rental vehicle owned by Hertz Rent A Car.

37.     In April of 2024, investigators were again conducting mobile surveillance of McKINNEY and locations related to McKINNEY. While monitoring McKINNEY's GPS location data, investigators located the blue Nissan Rogue bearing California license plate 9GGV470 and observed it being driven by McKINNEY.

38.     On 04-15-2024, investigators were monitoring electronic surveillance at 365 N. Kendall Street. At approximately 1:46PM, a red sedan pulled into the shared driveway of 365 N. Kendall Street. The driver exited the red sedan and walked toward

the side door of 365 N. Kendall Street out of view. A short time later, the driver returned to the red sedan. At approximately 1:53PM, McKINNEY is observed walking down the driveway and approaching the red sedan, at the front passenger side window. As McKINNEY approached the sedan, his right hand was closed as if he was holding on to something in his palm. As McKINNEY approached/leaned toward the open passenger front window of the red sedan, he placed his closed right hand into the red sedan's passenger front seat area. McKINNEY was observed at the passenger front window of the red sedan for a short period of time, before walking away toward the side door of 365 N. Kendall Street. Based on the investigation team's training and experience, persons who deal in controlled substances will conduct hand-to-hand transactions while exchanging drugs and money, in a similar fashion to what was observed when McKINNEY interacted with the driver of the red sedan.

39.     On 04-05-2024, Battle Creek Police investigators completed a search warrant application to utilize a cellular phone site simulator in attempt to locate which residence McKINNEY's cell phone was located. The search warrant application was reviewed and Calhoun County Circuit Court Judge Brian K. Kirkham signed the search warrant authorizing the cellular phone site simulator use. On 04-18-2024, investigators deployed a cellular phone site simulator device. It was determined with high probability that McKINNEY's cell phone, **Subject Device 1**, was physically located inside the residence at 365 N. Kendall Street, Battle Creek, MI.

40.     On 04-19-2024 it was determined that McKINNEY had returned the Nissan Rogue rented from Hertz Rent A Car. Investigators subpoenaed Hertz for

McKINNEY's rental records. The records indicated McKINNEY had recently rented a 2020 Hyundai Santa Fe bearing a Florida license plate AF52GT and McKINNEY provided a different phone number, 269-261-4745, on the rental agreement. Commercial records indicated 269-261-4745 was registered to Akil McKINNEY.

41. On 04-23-2024, investigators observed McKINNEY getting into the driver's seat of the 2020 Hyundai Santa Fe, parked in the driveway of 365 N. Kendall Street.

42. During the course of the investigation, investigators continued to observe the GPS location data from **Subject Device 1** indicating "no location return for target," for different periods of time during the months that McKINNEY's cell phone location was being monitored. Based on the investigators' training and experience, it is known to that persons involved in illegal drug activity will attempt counter-surveillance measures, such as turning off their cell phones, to conceal their location and movements during illegal drug activity.

43. On 04-29-2024, investigators obtained a state of Michigan search warrant for cell phone GPS locations regarding the phone McKINNEY used (269-261-4745) on the Hertz rental agreement for the 2020 Hyundai Santa Fe. The search warrant was reviewed and signed by Calhoun County Circuit Court Judge Kirkham. On 04-30-2024, investigators were monitoring GPS location data for both **Subject Device 1** and 269-261-4745. At approximately 7:30PM, McKINNEY's rented Hyundai Santa Fe was observed leaving 365 N. Kendall Street. At approximately 7:53PM, investigators received cell phone GPS location data for both **Subject Device**

**1** and 269-261-4745, indicating the phones were moving in an easterly direction on I-94 toward Detroit from the Battle Creek area. The GPS location data was monitored as both cell phones made their way to the Detroit area, stopping in an area north east of Dearborn, MI. GPS location data indicated the two cell phones remained in that area until approximately 3:38AM on 5-01-2024. GPS location data indicated both cell phones had moved to a hotel district across from the Detroit Metropolitan Airport. The phones remained in that location until approximately 6:52AM when the GPS location data indicated the phones had begun to move in a westerly direction on I-94 toward Battle Creek. As the phones came in to the area of Albion, MI, investigators conducted mobile surveillance along I-94 in an attempt to observe the vehicle McKINNEY's phones were travelling in. Investigators located the rented 2020 Hyundai Santa Fe, bearing a Florida license plate AF52GT. Investigators positively identified McKINNEY as the driver of the Santa Fe. McKINNEY was followed as he drove directly to the driveway area of 365 N. Kendall Street. Approximately ten minutes later, investigators observed the Santa Fe leaving the driveway at 365 N. Kendall Street and proceed in a southerly direction on N. Kendall Street. Investigators lost sight of the Santa Fe in the area of N. Kendall Street and Ann Avenue. GPS location data indicated **Subject Device 1** and 269-261-4745 were located within approximately 182 meters from the intersection of Ann Avenue and Howland Street, but investigators were not able to observe the Santa Fe in that area.

44.     On 05-01-2024, investigators continued surveillance in the area of 365 N. Kendall Street and a white Chevrolet Tahoe was observed pulling into the

driveway of 365 N. Kendall Street. A short time later, McKINNEY was observed exiting a door on the south side of 365 N. Kendall Street and walking toward the front passenger window of the Tahoe. McKINNEY was observed reaching into the open front passenger window with a closed fist as he lowered his hand toward the seat. Investigators observed McKINNEY then walking away from the Tahoe, back into the door on the south side of 365 N. Kendall Street. Investigators surveilled the Tahoe as it drove south away from 365 N. Kendall Street until a marked Battle Creek Police vehicle effected a traffic stop of the Tahoe in the area of M-66 and I-94, in the city of Battle Creek. Multiple traffic violations were observed by the surveillance investigators prior to the traffic stop. Constant observation of the Tahoe was maintained from the time it left 365 N. Kendall Street until it was stopped by the Battle Creek Police. The Tahoe made no stops and no one was observed in contact with the Tahoe.   During the course of the traffic stop, the female lone occupant/driver gave Battle Creek Police consent to search the Tahoe. During the search of the vehicle, suspected fentanyl was located in a void in the center console. The female admitted to Battle Creek Police that it was heroin (suspected fentanyl) and that she had purchased it but would not tell Battle Creek Police who she purchased it from. The Battle Creek Police Department drug evidence laboratory later conducted a field test of a portion of the suspected fentanyl, the field test results were inconclusive.

45.     Within approximately 48 hours of 05-01-2024, investigators conducted a successful purchase of crack cocaine and heroin (suspected fentanyl) from McKinney, utilizing Y. Investigators met Y at a predetermined location where Y and

Y's vehicle were checked for US currency, drugs and weapons, with none found. Y was provided an amount of prerecorded U.S. currency for the purchase of drugs. Y contacted McKINNEY on **Subject Device 1**, and ordered an amount of crack cocaine and heroin. McKINNEY and Y agreed to meet at a location in city of Battle Creek. Surveillance was initiated on 365 N. Kendall Street and investigators observed McKINNEY getting into the driver's seat of the rented Hyundai Santa Fe, Florida license plate AF52GT and leave the driveway of 365 N. Kendall Street, driving the Santa Fe. McKINNEY was observed driving to 62 Ann Avenue, pulling all the way to the back of the driveway, near the detached garage. McKINNEY exited the Santa Fe and walked into the detached garage. A short time later McKINNEY was observed walking back out of the garage and getting back into the driver's seat of the Santa Fe. The Santa Fe was observed leaving 62 Ann Avenue, making several seemingly unnecessary turns, before driving to the agreed upon meeting location with Y. Constant surveillance of McKINNEY was maintained during the drive to the meeting location with Y, McKINNEY made no stops on his way to the meeting location. Based on the training and experience of the investigators, subjects making unnecessary turns in route to an illegal drug transaction, do so in an attempt to observe/elude police surveillance that may be following the drug trafficker in an unmarked vehicle.

46.     Upon McKINNEY's arrival at the meeting location, investigators observed Y make contact with McKINNEY at the driver's side door of the Santa Fe. An apparent hand to hand exchange was made and Y was observed walking away from the Sana Fe. Surveillance of McKINNEY was continued and McKINNEY was

observed making contact with several other vehicles and individuals, conducting apparent hand to hand transactions. Based on the training and experience of the investigative team, this type of activity is consistent with the sale of illegal drugs. Investigators followed Y to a pre-determined location where Y and Y's vehicle were checked for US currency and weapons, with none found. Y turned over a clear knotted off baggy containing an off-white chunky substance of suspected crack cocaine. Y also handed investigators a folded piece of paper containing a brown colored chunky substance of suspected fentanyl.  Y told investigators that Y just purchased the crack cocaine and heroin (suspected fentanyl) from McKINNEY.  A field test of a portion of the suspected crack cocaine was conducted and a positive reaction for the presence of cocaine was observed. The Battle Creek Police laboratory conducted a field test of a portion of the suspected fentanyl.  The field test resulted in a positive indication for the presence of fentanyl.

47.     On 05-02-2024, investigators made state of Michigan search warrant requests for both 365 N. Kendall Street and 62 Ann Avenue, Battle Creek, MI.  The search warrant requests were reviewed and signed by Calhoun County Magistrate Shannon Topp. On 05-03-2024, Investigators and members of the Battle Creek Police Department Emergency Response Team executed both search warrants at 365 N. Kendall Street and 62 Ann Avenue, for evidence related to the sale of crack cocaine and fentanyl.

48.     In the kitchen of 365 N. Kendall Street, officers located a Gushers box with several baggies, one containing an off-white chunky substance.  The box was

next to a digital scale.  Subsequent lab testing confirmed the baggie contained 106.31 grams of cocaine.  The box was subsequently tested for fingerprints and contained a print that was a match with McKinney's.  In the cabinet above the refrigerator, officers found more drugs.  A tied off baggie contained more off-white, chunky powdery substance.  Subsequent lab testing confirmed it was 11.3631 grams of fentanyl.  In the kitchen, officers also found a Glock 9mm handgun as well as four Glock .45 caliber magazines in the upper cabinet to the left of the sink.

49.     In insulation by the basement stairwell, officers located two other bags of drugs.  Laboratory testing confirmed that one bag contained 135.99 grams of fentanyl and the other bag contained approximately 235.09 grams of cocaine.  In the living room, which was adjacent to the kitchen, law enforcement found the **Subject Devices 1 – 4** on a glass table. Three of the **Subject Devices** were inside a green fanny pack, the remaining **Subject Device** was next to the green fanny pack sitting directly on the glass table top. McKINNEY made a spontaneous utterance as investigators were seizing the **Subject Devices,** stating that the three phones inside the fanny pack were not his, but the single phone on top of the glass table belonged to him.  The fanny pack with three of the cell phones contained $1,288.00.  One of the bills in this stack of money matched a serial number from the controlled buy from McKinney that occurred within 48 hours of 05/01/2024.

50.     In the upstairs bedroom, officers found a Glock 19 Gen5 9mm handgun with magazine placed underneath the mattress.  McKinney was the only individual at home during the search.  Various cards in McKinney's name, residence paperwork,

and clothes that fit McKinney (who is 6'5" tall) were also found in the house.

## TECHNICAL TERMS

51.     Based on my training and experience, I use the following technical terms to convey the following meanings:

  a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

  b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

  c.     Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some

27

portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28

52.    Based on my training, experience, and research, I know that the **Subject Devices** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, and GPS navigation device. They also likely have the ability to connect to the Internet and were likely assigned Internet IP Addresses when connecting to the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and whether the device was used in furtherance of drug trafficking.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

53.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

54.    *Forensic evidence.*    As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Device was used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on **Subject Devices** because:

   a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

55.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant and permit the review of any prior extractions made from the Subject Devices under the original state warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

56. *Manner of execution.* Because this warrant seeks only permission to examine the **Subject Devices** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

57. I submit that this continuation supports probable cause for a search warrant authorizing the examination of the **Subject Devices** described in Attachment A to seek the items described in Attachment B.